Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. Thank you and counsel, welcome to the Fourth Circuit. Our first case, case number 20-1937 and look forward to hearing from Jowite with Mr. Oring. Thank you, Your Honor. May it please the Court. My name is Ira Oring and I represent Jowite Limited Partnership. Jowite has brought this action to recover from the collapse of Building 300 of the Jowite Apartments, which is a two-story, eight-unit apartment building that's owned by Jowite and insured by a federal insurance company. We seek to hold federal insurance liable under the terms of its policy. There is coverage under this policy because the following facts are undisputed. Number one, Building 300's foundation was defectively designed and constructed. The building was located in an area of organic soil. The foundation did not go deep enough, nor was it constructed appropriately, causing the building to sink under its own weight. One side of the superstructure was about a foot lower than the other. There were large cracks in the brick facade. The windows were inoperable and the building was not occupied for several years. It still is unoccupied, of course. Building 300 suffered a collapse. Collapse is a recognized peril under an all-risk policy such as the one in this case. It was not excluded by federal insurance under Maryland law. If not otherwise defined, which it was not here, collapse is any serious impairment of structural integrity. As we indicated in our brief, federal insurance admitted when we made requests for admissions that, indeed, Building 300 had a serious impairment of structural integrity. The collapse was due solely to the defective design and construction of the foundation. There was no issue with the superstructure. We quoted federal insurance expert Nicholas Palumbo at page 20 of our brief, where he stated, you could have other problems, like I say, with the superstructure that weren't evident, but it appeared that the building was acceptable and the failure was with the foundation. It sounds like the collapse is the damage. The collapse is the result of the problem with the foundation. Your Honor, something can be both a peril and the damage. I'll give the court an example. Fire, for instance. Fire is the peril and the damages are fire damages. The same is with water. Water is the peril and they're water damages. The same is with collapse. Collapse can be both a peril. It's a recognized peril as well as the resulting damage. What damage did the collapse cause? The damage caused the issues that I've already indicated, which is the fact that one level of the building was a foot lower than the other, that there were cracks in the facade, windows did not open. That is the collapse. The structural integrity, the impairment of the structural integrity is the collapse. A collapse can be a peril and a result, but surely not in the same case. Here you're defining the result, the damage, as collapse and also trying to say that the collapse caused the collapse. I'm defining the damage resulting from the collapse. If there's a fire, the fire is the peril and there are also damages solely resulting from the fire. The damages are not fire. The damages are things like something was incinerated, something is missing because it is burned up, or there's smoke damage. It's not fire is the damage, it's the results of the fire. Here it looks like your collapse is the damage that was caused by what you're calling the collapse. I think that is exactly the issue that was confronted by the court in the state of Washington case, which is Vision 1, where the defendant stated that the collapse can't be both the peril and the damage. The court held that it was. No, there the collapse was the peril because something collapsed onto another thing and caused a separate damage. Collapse can surely be a peril and a damage, but in that case it was the peril that caused a different resulting damage. Your problem in this case is that you need collapse to be the peril, not just the result, not just the resulting damage. It seems circular to say the collapse caused the collapse. There was a serious impairment of structural integrity in this building. That is the definition of a collapse. As a result of that serious impairment, there were damages that resulted. One set of damages was the fact that the superstructure gave way because the foundation was not constructed appropriately. As a result of that, there was other damages such as the fact that windows wouldn't open. There were large cracks in the brick and things of that nature. It was unstable. I think that the failure to appropriately construct the foundation led to a serious impairment of structural integrity of the building. Counsel, to follow up on those questions, if the effect of the faulty construction is collapse, the direct effect, doesn't your position that collapse can be both the damage and the peril largely nullify the exclusion? I don't think so, Your Honor. If it's the exclusion, what was improperly constructed here is the foundation. We're not seeking recovery for the foundation. The foundation and the superstructure are separate and apart from each other. I understand that argument and understand how building is defined. I appreciate what you're saying there. Nevertheless, you're saying that the direct effect of the faulty design, the collapse, is a separate peril. It seems like the effect of that, at least in this case, maybe not in all situations, is that you've rendered meaningless the exclusion. I don't think so, Your Honor. The reason is, as Judge Hollander expounded in the Bethany Boardwalk case, Maryland is not one of those cases. Unlike Virginia, for instance, Virginia requires there to be attenuation, a separate and direct intervention between the effectively constructed properly and the resulting loss. Maryland does not require that. Under Bethany Boardwalk and Selective Way, for instance, Selective Way is a good example where the defective coupling of the water cooler directly led water to leak into the building. Go ahead. I'm sorry, Judge Alston. Go ahead. Isn't it true in Selective Way that there were different contractual provisions which defined the liability? I don't think so, Your Honor. I think that in Selective Way, it was a case just like this one where there was defective workmanship that directly caused the water damage to the interior of the building. I have a follow-up on Judge Rushing's question just a little bit. Whenever we're talking about general liability law, whether it's negligence or contractual liability, we have separate inquiries as to approximate cause and damages. It seems from your argument, and correct me if I'm wrong, sir, that you're merging the two. How can you have approximate cause and damages be the same inquiry? I don't think I am, Your Honor. The efficient approximate cause is, I think, a separate issue that deals with whether one exclusion or both exclusions apply. Whether the exclusion for settlement applies as well as the exclusion for defective workmanship, which we think clearly under Maryland law, you look at the efficient approximate cause to see what exclusion applies. Then you look at whether there's coverage under that exclusion. I believe that the defective design and construction of the foundation has an ensuing loss clause, which indicates that it provides coverage for apparel not otherwise excluded. Collapse is not excluded. I think this case is very much like Selective Way, where the ensuing loss flows directly from the excluded event. But under Maryland law, that's permissible, and that is the test under Maryland law, as long as it's a different property. Counsel, to follow up on the Selective Way, that's not a Maryland state court case, is it? No, it isn't. It's a federal case, Your Honor. And I appreciate the similarities in your argument in that case. But is there a Maryland state law case that says the ensuing loss does not need to be from a separate event? Your Honor, I think that there are certainly Maryland cases that have indicated that in connection with, for instance, the McEvoy versus security fire case, where the Court of Appeals found that for direct loss caused by an earthquake, for instance, there's no coverage, but there's coverage for the loss caused by a fire that directly ensues. So that the fire is caused directly by the earthquake. And if you look at Bethany Boardwalk, which is also a Maryland U.S. District Court case, it analyzed, going back to the early 1900s, Maryland law regarding ensuing loss and came to the conclusion that, unlike Virginia, for instance, Maryland does not require attenuation. Specifically distinguishing the court in Taha in Virginia, which said that attenuation is required. But it's not only the Maryland courts. Taha relied upon selective way to say that Maryland does not apply the consensus view. That Maryland does not require attenuation. As did the court in Leap, which is another U.S. District Court case in Montana. So I think it's pretty clear, both from state and federal law, that Maryland views the ensuing loss can flow directly from the excluded peril. I did want to take a minute or two, if I could, to address the efficient proximate cause rule and the district court's determination that it does not exist and that the settlement exclusion bars coverage. And I think the crucial point here is that there are 19 exclusions that are applicable in the business and property coverage. Eight of those exclusions contain anti-concurrent cause language. The other 11 don't. And none of the exclusions that are relevant to the coverage in this case contain anti-concurrent cause language. But by denying the existence or refusing to employ the efficient proximate cause rule, the district court basically read all these exclusions the same. The district court found that any exclusion would be sufficient to bar coverage. And that would read out the fact that some exclusions have anti-concurrent cause language and some don't. And we have to ask ourselves, if Chubb believes that the efficient proximate cause rule is not applicable, then why did it include anti-concurrent cause language in its policy? Anti-concurrent cause language, of course, indicates that no matter where the exclusion falls in the chain, there's no coverage. And for instance, the nuclear hazard exclusion says that it is applicable no matter what other event contributes. And there are eight of those exclusions that employ efficient proximate cause language, and there are 11 that don't. And I would just point out that, as I indicated in our brief, in responding to our request for drafting notes in order to determine why some exclusions have anti-concurrent cause language and others don't, Chubb raised the efficient proximate cause rule. And it cited the Hartford-Steenboiler case, which is the grandfather of all cases in Maryland, indicating that courts look at the efficient proximate cause of any given event, and although there may be subordinate and determinant causes, in order to determine the rights and liabilities of the parties. And I refer to Chubb as federal insurance as a division of Chubb. And we agree with Chubb as to what it wrote in that submission to the court. It's not at all clear whether Chubb still agrees with what Chubb wrote, given the fact that his brief is not clear whether it embraces the efficient proximate cause rule, but I think it's quite clear from the case law that that is the law in Maryland, and that anti-concurrent cause language is used to abrogate the efficient proximate cause rule. And in this case, the settlement exclusion is a subordinate cause. It's not the predominating cause in producing the result here. I also think it's clear that the collapse was an ensuing loss, and I think just as in the State of Washington case, Division I case, it's both the damage and the peril. I see my time has run out. Thank you, counsel. You have some time left on rebuttal. We'll now hear from Mr. Green. Good morning. May it please the court, Bryant Green on behalf of the Federal Insurance Company. And what I'm here to do today is to ask this court to apply the plain and unambiguous text of the policy, nothing more, nothing less. Direct your attention to page 64 of the joint appendix, where the planning materials maintenance, planning design materials or maintenance exclusion is found. And before we even get to the ensuing loss language, I want to direct your attention to the first paragraph. And it says this insurance does not apply to loss or damage. Skip the parenthetical for just a moment caused by or resulting from any faulty, inadequate or defective. And then there's a list of things. Now, what Joe White would have this court do is say, you know, that the text doesn't actually say that. What it says is this insurance does not apply to only the defective building itself, regardless of any loss or damage caused by or resulting from the materials that follow. As if that language wasn't clear enough, we do have a parenthetical that says including the cost of correcting or making good. What that parenthetical tells us is that, yes, the defective material itself is included with that exclusion, but it's also intended to apply beyond that. That's exactly what Judge Sutton occurred and determined in the Sixth Circuit in TMW. That's exactly what the Northern District of Florida, upon which Judge Berdar relied in selective way. And that was from the Bartram LLC. And that language shows us that the text is supposed to apply beyond the defectively constructed material itself. Now, going down to the ensuing losses exclusion itself, it says the planning design materials or maintenance exclusion does not apply to. Counsel, if I could interrupt for just a moment. Obviously, we all understand this case went out on a Rule 56 summary judgment. And it appears that there's at least some disagreement amongst the experts in the case, one for Joe White, one for your side, as to causation. Since there is a dispute as to causation, why shouldn't a fact finder make the determination as to whether or not the circumstances of the contract apply in light of the differing opinions of the experts? I don't think there is a dispute of fact as to causation. I actually do agree with Mr. Oering on that. The experts do agree that defective construction contributed to this. Now, our experts say something else contributed as well, and that was settling. And between the defective design and the settling together, it caused the loss. Now, for that, you get into this almost philosophical discussion about what is a cause. And, you know, you could go to your first year torts class and talk about Paul's graph and Long Island Railroad and Judge Andrew's dissent, where he says, look, there are infinite causes for any particular phenomenon. And that's true. You know, we could go to the dawn of time and find things that contributed to this loss that aren't an issue in this case at all. Now, I actually also agree with Mr. Oering that in general, the efficient approximate cause rule will help us determine what exclusions to apply. Mr. Oering cites me to my own letter of 2019. And then we also look at Judge Grimm's opinion in McWhorter. I'd submit to you that I argued the McWhorter case. And if you look at the text of that opinion and my brief there, it's the exact same language. I'm not denying that the efficient approximate cause rule applies. I'm saying that in a situation like this, the exclusion itself makes it so that the exclusion is going to apply unless there's apparel not otherwise excluded. So the planning and design material maintenance exclusion itself incorporates the remainder of the exclusions. So we're not denying that this was caused by defective design. We agree with that. We're saying in addition to the defective design, it was also caused by settlement, both of which are excluded. Even if this court was inclined not to agree with us with regard to settlement, and I submit that it probably should agree with us with respect to settlement, just as Judge Boardman did. That's still a sufficient basis in itself to reach the right conclusion with regard to the multi-workmanship exclusion. Did I answer your question, Your Honor? You're fine. Thank you. So going down to the exclusion, we see that there are three elements that must exist. One, an ensuing loss or damage. Two, caused by or resulting from apparel. And three, apparel must not be otherwise excluded. Now, there's been much made to do about the distinction between a consensus approach and whatever the alternative that Maryland would apply. Now, I think it's already been indicated that there has been no specific Maryland state court authority rejecting what this court has previously adopted as the consensus approach. But the only authority that we have is from McEvoy, and I refer you to that case. It actually comes from the genesis of ensuing loss clauses, the early 1900 San Francisco fires. And in those cases, the problem was we had an earthquake, which were generally excluded. But we had all these subsequent causes. When the buildings fell, fires ensued, looting ensued, crime, all this kind of parade of horribles. And people wanted to shoehorn their coverage into the earthquakes. And so the distinction that the court drew way back in the early 1900s was between earthquake on one hand and, quote, independent destructive forces on the other. Now, we're not talking about civic ensuing lost language or, you know, independent, you know, the more modern language. But we are drawing a distinction between multiple independent destructive forces. And that's what the text of this policy requires. Moreover, even Selective Way before Selective Way was decided before this consensus approach discussion in the Fourth Circuit in the Eastern District of Virginia got started. Even then, Judge Brodar was determined that the water loss in that case was, quote, a step removed from the multi-workmanship and was not directly caused by it. So even though the courts have been talking about this distinction between a consensus approach on one hand and whatever the alternative in Maryland is on the other, we are still drawing distinctions between different causes. The same isn't true in Bethany Boardwalk, where Judge Hollander says that the roof damage was, quote, inextricably intertwined with the multi-workmanship. He's saying that the damages are so entwined with each other, they can't be distinguished. And that's what's true in this case. Moreover, Judge Hollander said in that case, an ensuing loss provision does not cover losses caused by the excluded peril, but rather causes loss to other property wholly separate from the defective property itself. And there is no property wholly separate from the defective property itself in this case. Now, as we go back to the text of the policy, this exact policy, the exact same language we're talking about today, has been determined by eight different judges across the country to apply just as federal as they're advocating right now. Once at a district court in Michigan, two judges, including Judge Sutton, adopted this position in TMW. One, very critically, is in Judge Berdara's opinion in a selective way, he was relying and said that this case is on all fours with and squares with the Barber and LLC, which is a Florida case. In that case, the court was presented with, one, Judge Sutton's opinion in TMW, and two, alternative policy language in another case. The court drew a distinction between Judge Sutton's opinion in TMW and the policy at issue in that case based on the exact parenthetical that exists in this case. And that in itself alone indicates that this policy, in and of itself, the text, should be interpreted as federal as advocated in this case. Moreover, this court, albeit to strike that, when this court brought up the idea of a consensus approach as an alternative to whatever Maryland law applies, that distinction, this consensus approach language, was a curiam opinion from this court basically adopting the district court. Now, what's interesting in TAJA, the case to which I'm referring, the court did not reject outright Maryland's application of this consensus approach. It said they are reluctant to impose it. And that even in selective way, when we look at it, Judge Bredar made clear that he was interpreting the policy in according to it, that the policy is interpreted according to its terms. And that is all federal is asking in this case, for this policy to be interpreted according to its terms. Now, while the Court of Appeals has not spoken directly on the subject of ensuing loss provisions in recent years, what we do know about Maryland that distinguishes it from Virginia and many other cases in many other jurisdictions, is that Maryland maintains strict fidelity to the terms of the policy itself. Unlike many jurisdictions that interpret policies in favor of the insured, Maryland does not. And it only does so in case of an ambiguity. Here, the parties agree that there's no ambiguity. The court has ruled very early in this case that there's no ambiguity. Given that that's the case, there's no excuse for interpreting the contract in favor of an insurer. But rather, we should apply the plain terms as they are written. So, counsel, if I could just make sure I'm understanding your description of Maryland law with respect to the question of whether the ensuing loss applies to some separate event. It sounds like you're saying you're not entirely sure what Maryland law is, but it at least requires something identifiable like an independent force in the case of a fire with an earthquake. I just want to make sure I understand your position on whether any separateness is required in terms of our analysis. Now, yes, I do believe that there must be an independent destructive force. I believe that in order to constitute an ensuing loss, there must be an alternative legal but-for cause. But what I would caution, what I would advocate for, is I don't think it's necessary to espouse a bright-line rule that applies to all insurance cases. So, for example, in tort cases in Maryland, we apply contributory negligence. In most other jurisdictions, we do not. That's because those rights come from the jurisdiction itself. It's the court's responsibility to articulate what those rights are. In a contract case, by contrast, the parties' rights are determined by the contract itself. So, it's probably inappropriate to say as a matter of all ensuing loss provisions from now until time immemorial, we're going to apply a consensus approach or not. Rather, what I think Maryland courts do very consistently and very regularly and rightfully is they take a critical look at what the text of the policy says. If the text of the policy is ambiguous, if it doesn't have things like this particular parenthetical in this one, if it's worded differently to suggest that the ensuing loss clause could apply more broadly, then, yes, interpret the policy as written. But here, the policy that we have in this case specifically indicates. So, you would have to throw out the canon of construction that prohibits superficialist language in order to find a ruling in the insurer's favor in this case. So, yes, I do believe that, in general, ensuing loss clause will only apply when there's an alternative covered legal but for cause. But I don't think it's necessary to espouse an overbroad rule in this case. And I think that's even what you see in Bethany Boardwalk. In fact, Judge Hollander drew a distinction. She said, in all but the most, I don't want to mistakenly report that I'm directly quoting her, but in all but the most extreme cases, the ensuing loss is going to be a but for cause. But I think as Judge Rushing observed in her question, that's not true here. You cannot say, but for the collapse, the building would have sunk. You cannot say, but for the collapse, the window would have opened. The collapse is not a cause at all. It's an adjective. It's a description of what happened. It's a state of the existence of the building as it is present. It's not something that happened in time and space. Mr. Oring referred this court to Vision 1, where, as Judge Rushing accurately observed, that involved a collapse of a structure down on top of another, causing additional damage. What Mr. Oring omitted reference to is Spring v. Safeco Insurance decided the exact same day from the exact same court. In that case, there was a building with an exterior deck with thin walls, and there was moisture intrusion, which caused an impairment of structural integrity, just like the case here. Now, the deck didn't fall. Counsel, let me ask a question if I could. You've relied on the fact that the terms of the contract are going to be the most significant thing that this court can consider, and it's clear from the contract that the term building is defined specifically, but the term superstructure does not appear in the contract. Does that in any way undermine your position? I don't think so, Your Honor, and here's why. One, yes, I agree that there – I actually don't contest the principle that the building, the superstructure can be distinguished from its foundation. But when we apply the text of this exclusion, none of those words are used. What is actually used is the fact that there must be, one, an ensuing loss or damage, two, caused by apparel that's not specifically otherwise excluded. So even if these can be distinguished as separate pieces of property, those three elements necessary to apply this exclusion have not been satisfied. In fact, when you look at the Bethany Borvalk case, you see kind of the problem that arises when you try to draw this distinction, because smart attorneys can always find a way to, you know, minimize the faulty workmanship portion of it. So when Bethany Borvalk was decided, the gist of the summary judgment opinion in that case was the roof was defectively constructed, but the interior water damage caused by rain and wind and the storm were not. Now, after the insurer basically lost that case, they filed a motion for reconsideration. What they did was they went back to Judge Hollander and they said, hey, actually the entire roof wasn't defectively constructed, only a portion of it is. So we still want the insurer to pay for the portion of the roof that wasn't defectively constructed. And if we buy into this line of analysis presented by Joe White, we're going to get into these disputes that have nothing to do with the text of the policy, but we're going to say, you know, now it's not the entire foundation that was defectively constructed. It was only one half of it, or it was only a few center blocks, or it wasn't the construction of the foundation at all. It was the architect who designed it. And so if we start going down this road of analysis, we're going to lose the fidelity to the text of the policy, and we're going to get into this hair splitting of what the loss actually is. And before I conclude, I do want to address the settlement exclusion. And quite frankly, if we were to adopt Joe White's position in this case, I don't understand when, if ever, the settlement exclusion would apply. The text of the exclusion says that it does not apply to loss or damage caused by or resulting from settling, cracking, shrinking, bulging, expansion of land, paved or concrete surface, foundations, pools, buildings, or other structures. Now, I fully respect the idea of the ensuing loss clause. As I've indicated before, I've argued that position many times. In fact, Judge Grim just issued an opinion last week in Hamilton Jewelry, where he again relied on Harford Seamroller for the proposition that that doctrine does exist. So I'm not contesting that the efficient approximate cause rule is a thing that exists. But what we need to keep in mind is that these rules are analytical devices that we are using to determine what the parties agree to and what their contract says. So here, when we look and we see that the ensuing loss exclusion only applies, if we can identify a, quote, peril not otherwise excluded, the efficient approximate cause rule cannot mean that only one exclusion applies and none others can. Because one exclusion, by its very text, incorporates others. So all these rules have to take a backseat to the text of the policy that the parties agreed to. And that's all the points that I've prepared in the last two minutes, Your Honors. I'd be happy to field any other questions, but I think I've articulated my prepared points and I've addressed on the briefs. Thank you, Counsel. Judge Rushing, Judge Alston, any other questions for Mr. Green? No. No. Okay, thank you. We'll hear from Mr. Waring. I think you have five minutes. Thank you, Your Honor. Let me, if I can, address some of the points that my colleague just raised. He cited selective way and language in selective way that the damage in that case was a step removed from the faulted workmanship and was not directly caused. What he was addressing was the damage that was claimed in Kearney, which was a case he discussed, for repair of the very property that was damaged by the faulty workmanship. And the quote is, plainly the damage claimed in Kearney was for repair of the property directly damaged by faulty workmanship. In the instant case, no claim has been made for repair of the faulty fitting on the water cooler line. Rather, the claim is for the water damage resulting from the failure of the faulty installed fitting. Thus, the damage is a step removed from the faulty workmanship and not directly caused by it. And the point is that as in Sprague, which Mr. Green was about to mention, you can't recover the property that is the result or the damage caused by the faulty workmanship. And that's what the distinction was being made in selective way by Judge Bedard. I also want to mention Mr. Green's reference to the inextricably intertwined language that he said Judge Hollander used in Bethany Boardwalk. What Judge Hollander was referring to was the insured's claim in that case that the roof, which was defectively constructed, was covered because the damage was caused by wind damage. Therefore, the insured was making a claim to recover for the defective property itself. And what Judge Hollander said is that the wind damage and the defective construction of the roof are inextricably intertwined, and therefore, the defective property itself is not covered, which is clearly different from what we are talking about here. I also want to point out that Mr. Green indicated that Bethany Boardwalk stood for the proposition that an independent destructive force is required for ensuing loss. And I will say that that is turning that case on its head. Judge Hollander stated in Bethany Boardwalk that Maryland does not require an independent destructive force. It does not require attenuation. It requires three things. One, that the ensuing loss be a covered peril. Two, that it be the cause of the damage in question. And three, that it be the property that is separate and apart from the defective property. And I think that we have met all three of those elements. Collapse is a covered peril. The collapse was both the peril and the cause of the damage, and it was to property that is separate and apart from the defective property because the superstructure is distinguished from the foundation of the building by the policy. I also want to say a few words, if I can, about the TMW opinion. The TMW opinion is a Sixth Circuit case that arose from Michigan, which does adopt the consensus approach to ensuing loss. It requires attenuation. And the import of that opinion is that the language in the exclusion that refers to the cost of making good does not refer to the cost of making good what is in the exclusion, but it refers to the exception to the exclusion, which talks about the ensuing loss. And to me, I think the dissent had a much stronger argument that the reference to cost of making good in the exclusion talks about the cost of making good to the property that has been excluded. The language is that this exclusion does not apply to the cost of making good, and I'm looking for the exact wording of the exclusion. This insurance does not apply to loss or damage, including the cost of correcting or making good, caused by or resulting from any faulty, inadequate, or defective, and then it goes on to say. And clearly, the language, cost of correcting and making good, applies to the exclusion itself. It doesn't apply to the ensuing loss. And I think that it would violate fundamental principles of Maryland law regarding the construction of insurance contracts to read that into the ensuing loss provision. Exclusions are to be read strictly in favor of coverage, and an exclusion by implication is not appropriate. And here, I think that's what the court is doing in TMW. The ruling is consistent with the law from the consensus view. Thank you, counsel. Your time's up, and we very much appreciate your arguments. To both of you, as you know, we typically, if we were in person, our tradition is to come down and greet you and shake your hand and thank you for your work. We're not able to do that in this virtual setting, but that does not mean we don't appreciate y'all's fine arguments and your fine briefing. Thank you very much.
judges: A. Marvin Quattlebaum Jr., Allison J. Rushing, Rossie David Alston Jr.